UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RICHARD BUCKLEY,

      Plaintiff,                                Civil Action No. 04-60188

v.                                      HON. MARIANNE O. BATTANI
                                            U.S. District Judge
                                            HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

      Plaintiff Richard Buckley brings this action under 42 U.S.C. §405(g) challenging a final  decision of Defendant Commissioner denying his application for Disability Insurance Benefits under sections 216(I) and sections 223 of the Social Security Act.   Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  I recommend that Defendant's Motion for Summary Judgment be DENIED, that Plaintiff's Motion for Summary Judgment be GRANTED, and that the case be remanded for an award of benefits.

## PROCEDURAL HISTORY

      On November 13, 2001, Plaintiff filed applications for Disability Insurance Benefits (DIB)  alleging an onset date of March 12, 2001 (Tr. 43).   After the initial denial of his application on February 5, 2002, Plaintiff requested an administrative hearing (Tr. 29-32, 34).

On April 8, 2003, Administrative Law Judge (ALJ) Earl A. Witten conducted a hearing in

Lansing, Michigan (Tr. 126-160). Plaintiff, represented by attorney Mikel Lupisella,

testified. (Tr. 130-153). Donald Heckler, Vocational Expert (VE) also testified (Tr. 153-

159). ALJ Witten found that Plaintiff was not disabled because although unable to perform

his past relevant work, he could perform a "significant range of sedentary work (Tr. 23). On

July 14, 2004, the Appeals Council denied review (Tr. 3-5). Plaintiff filed for judicial review

of the final decision on August 30, 2004.

## **BACKGROUND FACTS**

Plaintiff, born July 4, 1959, was age forty-four when the ALJ issued his decision

(Tr. 43). He received a high school diploma and worked as an assembler (Tr. 16, 131).

Plaintiff alleges that he became disabled due to avascular necrosis (AVN) of the left ankle

(Tr. 16).

### A.      **Plaintiff's Testimony**

Plaintiff testified that he was six feet tall and weighed 275-280 pounds (Tr. 130).

Plaintiff, right handed, reported that he lived with his wife and two teenaged children (Tr.

131). He testified that on March 12, 2001, he discontinued his work as an assembler because

his ankle pain, which he described as "excruciating," prevented him from completing an

eight-hour shift (Tr. 131). He stated that he had not worked since (Tr. 132).

Plaintiff, diagnosed with AVN of the left ankle, reported that since he stopped work,

his ankle condition improved due to his avoidance of standing and walking (Tr. 132). He

reported that when he was obliged to stand or walk for more than two hours a day, his ankle

-2-

became swollen and stiff, stating that he experienced pain if he attempted to stand or walk for more than twenty minutes (Tr. 132, 135).  He stated that after his ankle became swollen, the inflamation sometimes lasted for several days (Tr. 132).  He reported that his treating physician  told him that surgery would not improve his condition (Tr. 133).

Plaintiff stated that his limited mobility prevented him for pursuing crafts or social activities, but acknowledged that he could grocery shop for short periods (Tr. 134).  He indicated that he did not perform yard work, but completed minor household chores and helped his wife make dinner on a regular basis (Tr. 135).  He reported that he slept restlessly, due to pressure from the blankets on his ankle (Tr. 136).  He testified that he occasionally napped between half an hour and one and a half hours each day (Tr. 136).  He stated that he experienced pain if he had to sit for any length of time, adding that his need to adjust his ankle's position created calf, thigh, and sciatic pain (Tr. 137).

Plaintiff estimated that he could remain standing for up to an hour, but could not walk for more than four blocks without experiencing discomfort (Tr. 137).  He stated that he could lift up to twenty pounds if he did not place too much weight on his left ankle (Tr. 138).  He reported that his most comfortable position was sitting with his left leg  elevated (Tr. 138). He testified that his physician had prescribed a cane, which relieved the pressure on his ankle, but when he experienced more intense discomfort, he used an air cast on his ankle for several days (Tr. 139).  He reported difficulty bending and squatting (Tr. 140).  Plaintiff testified that he retained a driver's license, but drove only short distances (Tr. 140). He stated that he was prescribed a CPAP machine for sleep apnea, but discontinued its use

because it did not "work properly" for him (Tr. 146). He reported that he used to hunt and fish frequently, but had not engaged in either activity since 2001 (Tr. 151).

Plaintiff testified that he received disability retirement and had received a work-related settlement in July, 2002 for $140,000 (Tr. 152). He stated that he had not applied for any jobs since discontinuing work in March, 2001 (Tr. 153-154).

### B. Medical Evidence

In March, 2000, Warren Taranow, D.O., examined Plaintiff, noting that he complained of chronic left ankle pain since an injury a year and a half before (Tr. 92). Describing the appearance of Plaintiff's left foot "troubling," he stated that "[h]e has evidence of arthritis in the ankle, with large anterior tibial spurring" (Tr. 93). He recommended conservative treatment, but added that if such treatment failed, surgery was appropriate (Tr. 93).

In June, 2000 Dr. Taranow, noted that a "left subtalar joint injection gave [Plaintiff] some dramatic relief although he is still severely disabled" (Tr. 90). He recorded that he was "shocked by the severity of the pathology noted on this study," diagnosing Plaintiff with "AVN of nearly the entire talus" (Tr. 90). He recommended that Plaintiff consider permanent work restrictions, suggesting that Plaintiff should be working at a "sit down" job (Tr. 90). In August, 2000 Dr. Taranow prescribed a wheelchair and crutches, adding that due to Plaintiff's discomfort, he would consider prescribing "narcotic analgesic" if his current medication did not improve his condition (Tr. 87). Dr. Taranow, noting that an untrained eye could not discern Plaintiff's condition, recorded that he believed that Plaintiff's boss and co-

-4-

workers had the false impression that he was malingering (Tr. 87).   In January, 2001 Dr. Taranow, upon finding that Plaintiff's pain was worsening, prescribed Darvocet and cushioned heel lifts (Tr. 86).  In March, 2001 he noted that Plaintiff experienced severe pain and swelling, along with stiffness (Tr. 85).[1]  Dr. Taranow prescribed six weeks sick leave, recommending that Plaintiff "retrain for a sit down type job" (Tr. 85).

 In June, 2001, Plaintiff sought treatment from Susan Mosier-LaClair, M.D., an orthopedic surgeon (Tr. 94-97).  She initially appraised Plaintiff as a candidate for total ankle replacement, attributing the AVN to his use of corticosteroid usage for a previous ulcerative colitis condition (Tr. 96).  In January, 2002, Dr. Mosier-LaClair noted that Plaintiff "still has pain, but it is much better and tolerable than before," adding that he was ambulating very comfortably," albeit with the aid of a cane (Tr. 125).  She recommended a followup visit in six months (Tr. 125).   In August, 2002, Dr. Mosier-LaClair noted that Plaintiff felt "much better" since he modified his activities (Tr. 124).  Plaintiff  reported that he had less pain since his last visit, however, Dr. Mosier-LaClair noted that his left ankle remained swollen (Tr. 124).  She opined that he could "get by" with an anti-inflammatory and occasional Darvocet (Tr. 124).

 In January, 2002 Dr. Gupta performed a Physical Residual Functional Capacity Assessment of Plaintiff on behalf of the State (Tr. 98-105). Dr. Gupta found that Plaintiff could lift up to ten pounds occasionally and less than five pounds frequently and retained the

---

[1]This examination, conducted on March 12, 2001, was also Plaintiff's last day at work.

ability to stand at least two hours in an eight-hour workday and sit for approximately six hours (Tr. 99). He found further that Plaintiff's retained only a limited ability to push and pull in the lower extremities, and should not be obliged to climb ramps or stairs; as well as balance, stoop, kneel, crouch, or crawl more than occasionally (Tr. 99, 100). Dr. Gupta noted that Plaintiff should *never* climb ladders, rope, or scaffolds (Tr. 100). He concluded by stating that Plaintiff was "fully credible," and stated allegations consistent with objective findings (Tr. 103).

### C.    Vocational Expert Testimony

VE Donald Hecker classified previous work as an assembler  as unskilled at the medium exertional level  (Tr. 154). The ALJ posed the following hypothetical question to the VE:

> "Now, assume I find that [Plaintiff's] residual functional capacity is such that he has the maximum sustained exertional work capacity to perform work which would allow him to lift ten pounds occasionally and five pounds on a regular basis. In order to perform that work, he'd require a sit/stand option with no repetitive bending, twisting, or turning. No crawling, squatting, kneeling, and climbing and no working a unprotected heights or working around unprotected moving machinery and no work that requires foot controls."

(Tr. 154).

The VE testified given the above limitations, Plaintiff could not perform his past relevant work, but using State of Michigan statistics,  could perform the work of an attendant (4,500 jobs), cashier (4,500), parking lot attendant (1,000 jobs), document sorter, (3,000 jobs), light assembler (3,500 jobs), and security monitor (1,000 jobs) (Tr. 155). The VE

added that in approximately sixty percent of the positions, Plaintiff would be allowed to elevate his foot to a maximum of twelve to fourteen inches (Tr. 155). He stated that his testimony was consistent with the Dictionary of Occupation Titles (DOT), with the exception of his opinion that sixty percent of the above positions could be performed with an elevated leg (Tr. 156). He explained that his opinion was based upon his "observation of jobs and then contact with other professionals in the field." He testified that if he accepted all of Plaintiff's testimony as credible, he would be unable to perform the above jobs, assuming the need to sit passively with his leg elevated above hip level up to sixty percent of the time (Tr. 157). In response to questioning by Plaintiff's attorney, the VE stated that if he needed to nap for half an hour to one and a half hours each day, all of the above jobs would be precluded (Tr. 158). He stated that Plaintiff would unable to perform any of the above jobs if he had to keep his ankle elevated to waist level (Tr. 158).

### D.    The ALJ's Decision

Citing Plaintiff's medical records, ALJ Witten found severe impairments of left ankle arthrosis with talar AVN and collaspse (Tr. 18). Nonetheless, he determined that although Plaintiff had a severe impairment or combination of impairments none met or equaled any impairment listed in Appendix 1 Subpart P, Regulations No. 4. (Tr. 18, 22 ).

He found that while Plaintiff was unable to perform any past relevant work as an assembler, he retained the residual functional capacity to:

"lift/carry five pounds frequently and 10 pounds occasionally. [Plaintiff] requires the option to sit or stand as needed. He cannot engage in repetitive bending, twisting, or turning and no crawling, squatting, kneeling, or

climbing" (Tr. 20, 23).

Stating that Plaintiff could perform a "significant range of sedentary work," ALJ Witten found that Plaintiff could perform the work of an attendant/cashier (4,500 jobs), attendant's work[2] (1,000 jobs), office work (3,000 jobs), assembly jobs, (3,500 jobs), inspector/packer/checker jobs (3,500 jobs), and security monitor (1,000 jobs) (Tr. 21).

ALJ Witten found that "[a]lthough [Plaintiff] has some limitations from his impairment, his symptoms and limitations are not credible to the extent alleged, nor supported by the objective evidence of record" (Tr. 19). The ALJ cited Plaintiff's "relatively infrequent" visits to his physician for his "allegedly disabling symptoms" (Tr. 19). He noted that in August, 2002, Plaintiff's physician noted that he was wearing a regular shoe and did not use a cane or any other assistive device (Tr. 19).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S.

---

[2]Although the ALJ did not elaborate on the term "attendant," the 1,000 attendant jobs cited by the VE alluded to a limited range of *parking lot* attendant positions (Tr. 155).

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*,   800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at

step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.      Listing 1.02(A)

Plaintiff argues first that the ALJ 's conclusion that he did not meet Listing 1.02(A) at Step Three of his analysis was "without basis and incomplete." *Plaintiff's Brief* at 9.  He maintains that his testimony and medical records of evidence demonstrate that he has met the listing. *Id.* at 11.  The pertinent portion of 20 C.F.R. Part 220, Appendix 1, § 1.02(A) states as follows:

> " *Major dysfunction of a joint(s) (due to any cause)*:  Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: (A) Involvement of one major peripheral weight-bearing joint (i.e ., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]"

> The regulations define "ineffective ambulation" as an "extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."

20 C.F.R. Part 404, Appendix. 1, § 1.00B2b.

Contrary to Plaintiff's position, the ALJ properly found that he did not meet

-10-

listing 1.02(A).    Admittedly, Plaintiff met a number of the traits necessary for a
finding of disability under 1.02(A).  First, two physicians confirmed that he suffered
from AVN, which created chronic joint pain and stiffness.  Second, objective
findings, such as the MRI ordered by Dr. Taranow which confirmed his diagnosis of
AVN meet the requirement that the medical conclusions were supported by
"medically acceptable imaging."  However, Plaintiff's own admissions and medical
records confirm that he did not "ambulate ineffectively", as defined in 1.00B2b,
which  requires that a claimant demonstrate the need for a hand-held assistive device
that requires the use of *both* hands such as a walker, or crutches, for a period of
twelve months or longer.

Plaintiff's medical history indicates that at some point in his treatment, his
ankle pain obliged him to use either crutches or a wheelchair.  In August, 2000, Dr.
Taranow prescribed a wheelchair and crutches (Tr. 87).  In addition, his daily activity
sheets dated December 1, 2001  reference the use of crutches and a wheelchair (Tr.
68).  Although Plaintiff states elsewhere in the same document that he regularly used
a cane, apparently, he used crutches when his ankle "gave out" (Tr. 74).

Assuming *arguendo*, that Plaintiff used crutches and/or a wheelchair on a fairly
regular basis from the time of Dr. Taranow's prescription, in August of 2000, as
pointed out by Defendant, Plaintiff did not cease work until March, 2001.  Hence, his
first six-seven months of crutch or wheelchair use cannot be used to establish
disability since at this time, because he was engaged in gainful employment.

-11-

Next,  one can reasonably conclude that  Plaintiff's need for either crutches or a wheelchair ceased by January, 2002, since at that time, Dr. Mosier-LaClair recorded that Plaintiff's condition had improved noticeably and that he was "ambulating very comfortably" with the use of a cane (Tr. 125).  In addition, Plaintiff's testimony does not mention the need for either a wheelchair or crutches, except to note that he had received a prescription for both in the past (Tr. 139).  He indicated that he used a cane for walking outside of home, and made "short trips around the house" without any assistance (Tr. 139-140).  Notes from an August, 2002 followup appointment indicate that Plaintiff did not bring a cane with him to his exam (Tr. 124). If one assumes, *arguendo*, that Plaintiff regularly used crutches or a wheelchair during a stretch of his treatment (a condition that would establish that he met listing 1.02(A)) the ALJ could still properly find that Plaintiff's temporary use of such devices did not mandate a finding of disability.  For the reason discussed above, the period before Plaintiff ceased work on March 12, 2001 could *not* be factored into a determination of how long Plaintiff used two-handed ambulatory aids.  Further, the ALJ  reasonably concluded  that  as of Plaintiff's appointment on January 30,  2002, he no longer needed  either  crutches  or  a wheelchair.  *See* 42 U.S.C. §423(d)(1)(A), *supra*. Plaintiff's temporary need for assistive devices requiring the use of both hands has not established "inability to engage in any substantial gainful activity" for twelve months or more.  Although Plaintiff argues that under listing 1.00B2b the inability to ambulate effectively also includes "the inability to walk a block at a reasonable pace

-12-

on rough or uneven surfaces," and "routine ambulatory activities, such as shopping and banking," Plaintiff conceded that he performed light shopping chores and could walk up to four blocks before resting (Tr. 134, 137). Substantial evidence supports the ALJ's finding that Plaintiff did not meet the listing 1.02(A).

### B. Credibility

Citing *Felisky v. Bowen,* 35 F.3d 1027 (6th Cir. 1994), Plaintiff argues next that the ALJ made a faulty credibility determination in rejecting his claim that he kept his foot elevated above hip level for 50-60 percent of his waking hours. *Plaintiff's Brief* at 12-16. Plaintiff points out that the state physician found him "fully credible" (Tr. 103).

*Social Security Ruling* (SSR) 96-7p states that it is not sufficient for the ALJ to make a single, conclusory statement that the individual's allegations have been considered or that the allegations are or are not credible. *Id*, 1996 WL 362209, at 34484. The ALJ's decision must be based on specific reasons for the findings of credibility. *Id*. These reasons must be supported by substantial evidence in the record. *Howard v. Commissioner of Social Security,* 276 F.3d 235, 242 (6th Cir. 2002); *Heston v. Commissioner of Social Security,* 245 F.3d 528, 536 (6th Cir. 2001); *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994).

C.F.R. §404.1529(c)(3) lists the factors to be considered in making a credibility determination, including daily activities, "precipitating and aggravating factors," treatment received for relief of symptoms, and additional considerations relevant to

functional limitations.  20 C.F.R. § 404.1529(c)(3).  As a general rule, the courts cede enormous latitude and deference to the ALJ's credibility determinations.  *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir. 1993); *Richardson, supra,* 402 U.S. at 401.

The Plaintiff's credibility regarding his need to keep his foot elevated above hip level is of critical importance, given the VE's testimony that if that were so, all work would be precluded.  In rejecting Plaintiff's credibility, the ALJ noted that the Plaintiff's "symptoms and limitations are not credible to the extent alleged, nor supported by the objective evidence of record" (Tr. 19), and that "objective medical evidence does not provide a basis for finding limitations greater than those determined in this decision" (Tr. 20).

Plaintiff's claim that he needs to keep his foot elevated above hip level, in order to reduce the swelling, should be assessed as a pain-related symptom.[3]  The SSA regulations, in particular 20 C.F.R. §404.1529, set forth criteria for evaluating subjective symptoms, including pain.  The factors to be considered under this section include consideration of objective medical evidence, although that particular factor is not, by itself, determinative:

_____

[3]Although the Plaintiff did not expressly state that he "needed" to keep his foot elevated above the hip 50 to 60% of the time, that was the clear import of his testimony (Tr. 138-139), and the VE construed it as such (Tr. 157) ("He states he sits during the day, 50, 60% of the time with his leg elevated to relieve pain.  Based on that aspect of his testimony, there'd be no jobs he could do").  *See also Plaintiff's Brief*, p.15.

-14-

"However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. §404.1529(c)(2).

Likewise in *Duncan v. Secretary of HHS*, 801 F.2d 847, 853 (6th Cir. 1986), the Sixth Circuit required "objective medical evidence of an underlying medical condition," but did "not require . . . 'objective evidence of the pain itself.'" *Id.* (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984). *See also Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) ("[O]nce the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence") (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996)).

Thus, both the SSA regulations and *Duncan* "require objective medical evidence showing an underlying medical condition." *Felisky*, 35 F.3d at 1039. It is beyond peradventure that such evidence is of record in the present case. That being so, *Duncan* poses two questions in the disjunctive: (1) whether the objective medical evidence confirms the severity of the alleged pain, *or* (2) whether the objectively established medical condition "is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Duncan*, 801 F.2d at 853.

Looking at part two of the *Duncan* test, even though there is no specific medical or clinical evidence directly supporting Plaintiff's alleged need to keep his foot elevated during a good portion of the day, there is a wealth of clinical evidence

-15-

and medical opinions showing that Plaintiff's underlying condition is extremely severe, so much so that it could "reasonably be expected to produce the alleged disabling pain" which could be alleviated only by keeping the foot elevated.  Dr. Taranow not only found the appearance of Plaintiff's foot "troubling" (Tr. 93), but stated that he was "shocked by the severity of the pathology," and indicated that he intended to consult with other specialists at a conference in New York City ("There are at least ten orthopedic foot and ankle specialists in the area and we can put our thoughts together for treatment options for this patient") (Tr. 90).  Significantly, Dr. Taranow stated:

> "Mr. Buckley continues to be severely disabled by his left ankle and hindfoot pain.  His injection helped him for some time but the pain has recurred.  He is having trouble at work.  *I think the biggest problem is the fact that he has severe pathology without significant objective signs that can be seen by the untrained eye.  I get the impression that his bosses and fellow employees think he is malingering when this is obviously not the case.*"  (Tr. 87) (emphasis added).

Dr. Mosier-LaClair, concurring in Dr. Taranow's diagnosis, stated, "[D]ue to the almost complete AVN (avascular necrosis) of the talus, that it significantly limits his options for relief of his arthritis pain" (Tr. 96). He was prescribed both anti-inflammatory medication and narcotic analgesics.

While  both Dr. Taranow and Dr. Gupta (the DDS physician) recommended "sit down" type work, which would alleviate some of the obvious pain caused by putting weight on the foot, they did not specifically discuss (either in their written evaluations or, apparently, with the Plaintiff) the Plaintiff's "self-help" remedy of

-16-

elevating the foot above hip level.  That, however, does not detract from either the efficacy or the necessity of that remedy, given the objectively supported severity of the underlying condition.  In *Deardoff v. Commissioner of Social Security*, 2002 WL 1461758, 81 Soc.Sec.Rep.Serv. 437 (E.D. Mich. 2002), the court was presented with a similar situation.  The claimant in that case testified that she was required to elevate her foot at least four times per day due to pain and swelling.  However, the ALJ rejected that testimony because nothing in the medical records substantiated that need: there were no physician's orders restricting claimant's activities, the medication prescribed was for only mild to moderate pain, the claimant testified that the medication in fact reduced her pain, and the state agency physician opined that the claimant could perform a range of medium work.  Nevertheless, applying a *Duncan* analysis, the court remanded for benefits, finding that "the objectively established medical condition in the plaintiff's right ankle was so severe that it could reasonably be expected to produce the pain about which the plaintiff complained.  The evidence to which the defendant points in its objections [see above] does not constitute substantial evidence to the contrary."  *Id.* At *2.

Likewise in this case,  the ALJ erred in focusing on the lack of objective evidence to confirm the severity of the  swelling and pain, to the exclusion of the alternative basis set forth in the second prong of *Duncan*–that the condition itself is so severe  it could reasonably be expected to produce the subjective symptoms alleged.   It is again important to note Dr. Taranow's observation that Plaintiff's

-17-

pathology is severe, even though there are no obvious objective signs, and that it might erroneously appear that he is malingering. Both Dr. Taranow and Dr. Gupta found that Plaintiff was credible (Tr. 87, 103).

In addition, the ALJ otherwise supported his credibility determination with weak or non-existent record evidence. The ALJ cited the six-month spread between his visits to Dr. Mosier-LaClaire between January and August, 2002 to establish that Plaintiff's condition was not disabling, omitting mention that the intervals between appointments were set by the physician and not Plaintiff (Tr. 125). Other portions of the decision unjustifiably discount Plaintiff's credibility. The ALJ cites Plaintiff's testimony that he bought a hunting license the year before the hearing as proof non-disability, but ignores Plaintiff's testimony that he was unable to use it (Tr. 19, 151). The ALJ improperly justified his credibility determination by citing Plaintiff's apparently unrealistic hope that he could recover enough to resume his prior sporting activities. None of these factors constitutes substantial evidence that Plaintiff's claims lack credibility.

While the "substantial evidence" standard which this Court employs is deferential to the ALJ's findings, the record must be viewed as a whole. "A substantiality of evidence evaluation does not permit a selective reading of the record." *Davis v. Apfel,* 133 F. Supp. 2d 542, 547 (E.D. Mich. 2001). *See also Cotter v. Harris*, 642 F.2d 700, 706 (3rd Cir. 1981) ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the

record"); *Kent v. Schweiker*, 710 F.2d 110, 114 (3rd Cir. 1983) ("Nor is evidence substantial if it is overwhelmed by other evidence..."). The record in this case, viewed as a whole, fully supports Plaintiff's testimony as to his need to keep his leg elevated to the extent he claims, and there is no substantial evidence to the contrary.

As in *Deardoff, supra*, the VE in this case testified that if Plaintiff's testimony were considered fully credible, there would be no gainful employment he could perform (Tr. 157-58). Therefore, this case falls within the ambit of *Felisky,* 35 F.3d at 1041, where the Court stated:

> "Our review of the entire record reveals that it is devoid of substantial evidence to support the ALJ's decision to discount Felisky's credibility. The VE testified that, if Fesisky's testimony were believed, Felisky is completely disabled. We therefore must find that the Secretary did not carry his burden of showing that Felisky possesses the residual functional capacity to perform substantial gainful activity."

In *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), the Court held that it is appropriate to remand for an award of benefits when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Id.* This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking. *Faucher,* 17 F.3d at 176 (citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985)).

As was the case in *Felisky* and *Deardoff,* no factual issues in the present case

-19-

remained unresolved.  The proof of disability is strong and there is no significant evidence to the contrary.  Therefore, the case should be remanded for an award of benefits.

**CONCLUSION**

For the reasons stated above, I recommend that Plaintiff's Motion for Summary Judgment be GRANTED, that Defendant's Motion for Summary Judgment be DENIED, and that the case be remanded for an award of benefits.

Any objections to this  Report and Recommendation must be filed  within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the

court.  The response shall address specifically, and in the same order raised, each

issue contained within the objections.

S/R. Steven Whalen<br>R. STEVEN WHALEN<br>UNITED STATES MAGISTRATE JUDGE

Dated:  August 24, 2005

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 24, 2005.

S/Gina Wilson<br>Judicial Assistant